**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**ERICK RAFAEL TORRES-BENITEZ,**

Defendant.

Crim. No. 24-179 (GMM) (MBA)

### REPORT AND RECOMMENDATION

Defendant Erick Rafael Torres-Benítez ("Torres") moved to suppress the firearms, magazines, ammunition, and drugs seized from his bedroom, car, and an outdoor shed as fruits of an illegal search in violation of his Fourth Amendment rights. (ECF No. 40). He also denied making any statements during the execution of the search warrant admitting to possessing any sort of contraband in his home, car, or the shed. (*Id.* at 14). For its part, the government contended that Torres failed to meet his burden under *Franks*, made voluntary statements, and the search of the shed fell within the scope of the warrant.[1] (ECF No. 47). Torres replied. (ECF No. 58). U.S. District Judge Gina Méndez-Miró referred the motion to suppress to me for a Report and Recommendation. (ECF No. 68). Having conducted a motion hearing and a three-day evidentiary hearing on the matter, (ECF No. 78, 94, 104, 109), and having received the parties' post-hearing submissions (ECF No. 121, 123), for the reasons set forth below, I recommend the motion to suppress be **DENIED**.

---

[1] The government's opposition also argued lack of standing, an argument it withdrew at the motion hearing as to the search of the lower level. (ECF No. 89 at 3). It also backed away from its argument that the affidavit would provide sufficient probable cause if the officer's alleged observations during surveillance were excised given that the only information that could be corroborated from the anonymous tip was that which was publicly available. (ECF No. 88).

**FACTUAL BACKGROUND**

<u>Introduction</u>

Like many, this case stems from the execution of a search warrant by agents from the Puerto Rico Police Bureau (PRPB). The warrant was issued by a local judge upon review of an affidavit submitted by PRPB Officer Joel Nuñez-Fernández (Nuñez), which stated that on April 30, 2024, he had been assigned a "special complaint," "which reported that on Palestina Street in the San Luis Ward in Aibonito . . . there is a two-floor residence on the left side at kilometer 1.1, painted in white and violet colors with the number 101 on the wall" where Erick lives. (ECF No. 55-1 at 1). Per the complaint, Erick is a "a light-skinned, black-haired individual, of approximately more than 6 feet tall and approximately 32 to 35 years of age." (*Id.*). And, of note, "Erick sells marijuana and cocaine in the aforementioned house and that he also has a black colored pistol. . . and a gray Nissan, license plate INJ-279." (*Id.*).

In his sworn affidavit, Officer Nuñez attested that he had surveilled Erick's home on two occasions. (ECF No. 55-1 at 1-3). On April 30, 2024, he saw Erick engaging in what he believed to be a sale of cocaine at 3:40pm and drive off to Colmado San Luis ("the colmado") in his Nissan at approximately 3:48pm where he appeared to conduct a second cocaine sale. (*Id.* at 2). The next day, May 1, 2024, Officer Nuñez again surveilled Erick's home and saw Erick sell marijuana around 4:52pm and subsequently drive off in his Nissan. (*Id.* at 3).

During the execution of the search warrant at Torres's home, agents found cocaine and $28,425.00 in Torres's bedroom, two firearms modified to fire as machineguns and additional cocaine and paraphernalia in an outdoor shed, and more cocaine in the Nissan after a second search warrant was obtained and executed. (ECF No. 47 at 4-6). Torres was then charged federally and indicted for being a felon in possession of a firearm, possession with intent to distribute control substances, and possession of a machinegun in furtherance of a drug trafficking crime. (ECF No. 1, 10). The affidavit

attached to the federal complaint stated that "[a]s PRPB Agents approached a wooden shed in TORRES BENITEZ's yard, TORRES BENITEZ told the PRPB Agents that he had more Cocaine and some rifles inside the shed." (ECF No. 1-1 at 4). Torres moved to suppress all evidence seized arguing in part that the affidavit was a work of fiction and not fact, given that it would have been "physically impossible" for him to have been selling drug from his home and the colmado, when he was at the gym 39 minutes later on April 30 and 6 minutes later on May 1. (ECF No. 40 at 6). And excising those false statements, the anonymous tip was insufficient for the warrant to have issued. (*Id.* at 10-12). Torres further argued that the search of the shed was outside the scope of the search warrant, which was limited to the first floor (his home). (*Id.* at 12-14). And he denied making any statements to the police officers at his home. (*Id.* at 14). Thus, he requested the Court "suppress all evidence as tainted fruit of constitutional violations." (*Id.* at 16). Along with his motion, Torres provided a sworn statement indicating that: (1) he did not sell drugs on the "dates and/or locations as alleged by the police officer"; (2) he went to the gym on April 30, 2024, at 4:19pm wearing his "regular gym clothes"; (3) he again went to the gym on May 1, 2024, wearing his "regular gym clothes"; and (4) his regular gym clothes "does not match the clothing that the police officer allege[d] [he] was wearing on April 30, 2024 and/or May 1, 2024." (ECF No. 40-2 at 1-2).

### The motion hearing

On September 9, 2025, I held a motion hearing to determine whether Torres had met his burden under *Franks*. (ECF No. 78 & 89). Days before the hearing, the government asked me to vacate the hearing and take judicial notice that the gym Torres attended was a mere 950 meters away from his home and 1 kilometer away from the colmado, the equivalent of a 2-minute drive, thus eliminating the "physical impossibility" factor argued by Torres. (ECF No. 72). For his part, Torres did not oppose the Court taking judicial notice of the locations, but disputed the government's travel time assertion, arguing this was an issue of fact requiring an evidentiary hearing. (ECF No. 73 at 2).

3

At the hearing, the government had proffered that it had taken agents 2 minutes and 30 seconds to make the drive down to the gym at approximately 30 mph on a Tuesday at noon. (ECF No. 89 at 9-10). Counsel for Torres called the Court's attention to a video taken during the April 30 surveillance related to the transaction at the colmado. (*Id.* at 11). Having heard from both parties and receiving their post-hearing submissions, I set an evidentiary hearing. (ECF No. 91).

**The evidentiary hearing**

1. **Torres's witnesses under *Franks***

Day 1- the gym

Torres presented the testimony of two employees of Health and Fitness, the municipal gym in Aibonito. Specifically, Jose Anibal Sante-Agustín ("Sante"), administrator of the gym, (ECF No. 99 at 11-48), through whom Torres introduced the daily attendance logs for the gym, Defense Exhibit ("DE") 4. (*Id.* at 12). Sante testified that it is the gym attendants themselves who write their names and times of entrance. (*Id.* at 17). Sante did not see Torres at the gym on April 30; however, he testified he could identify his signature, knew his name, and recognized him from going to the gym during his afternoon shifts in April and May of 2024. (*Id.* at 27, 33). The logs showed that Erick Torres signed in on Tuesday April 30, 2024, at 4:19pm (DE 4, ECF No. at 58-2 at 5)[2] and on Wednesday May 1, 2024 at 4:48pm. (*Id.* at 11; ECF No. 99 at 29, 42).

Next, Torres called Raúl Febus-Alvelo ("Febus"), a trainer at the gym and the person in charge of maintenance. (ECF No. 99 at 34-35). Febus confirmed that the gym attendant is the one responsible for signing the log. (*Id.* at 38, 45). Although there is no employee review of the log, "there's an order that lets you know the hour of the other client." (*Id.* at 46). And he stated he knew Torres from school and identified him in Court. (*Id.* at 38-39). Febus testified Torres would usually wear "shorts, basketball

---

[2] The transcript says 5:50pm but that appears to be incorrect. (ECF No. 99 at 29). The transcripts subsequently reflect the correct time of 4:19. (*Id.* at 41).

4

shorts, and a sleeveless t-shirt," "sort of an undershirt that you would wear under a shirt," and basketball shoes (*Id.* at 39-40). Still, he could not recall his "type of clothing" "exactly" because Torres "doesn't wear the same thing every day." (*Id.* at 48).

<u>Day 2- Surveillance and Search Warrant</u>

Nuñez, a PRPB officer assigned to the Drugs and Narcotics Division in Aibonito, and the affiant of the search warrant for Torres's home, took the stand and provided the following testimony. He conducted the surveillance after his sergeant assigned him to investigate a special complaint related to Torres. (ECF No. 116 at 8). The special complaint from an anonymous source indicated that Torres sold cocaine and marijuana from his house and had a firearm and a gray Nissan. (*Id.* at 8-9). Nuñez used a rented vehicle to conduct the surveillance.[3] (*Id.* at 9). And he took his monocular. (*Id.* at 10). On April 30, he drove to the street in from of Torres's house, "at a front angle from the house," along with Sergeant Eduardo Rivera ("Rivera"). (*Id.* at 14, 16). Around 3:40pm he saw Torres walk out of the house wearing a black t-shirt, black shorts, white sneakers, and a white baseball cap. (*Id.* at 16-17). Nuñez then saw another person approach Torres's home, greet him, and hand Torres some cash money. (*Id.* 17). Torres went back in the house and emerged seconds later and handed the other person some plastic baggies with a white powdery substance, which Nuñez understood to be cocaine. (*Id.* at 17-18).

Around 3:48pm, Torres left his house in the same clothes, but with a bag around his chest, got into his Nissan, and drove off down the main road towards Barrio Llanos. (ECF No. 116 at 19-20). Nuñez followed. (*Id.* at 20-21). Torres got to the colmado, where he did a U-turn and stopped in front. (*Id.* at 20). Nuñez stopped further ahead. (*Id.* at 21). Nuñez then saw someone approach the

---

[3] One of the assertions in the motion to suppress concerned whether Nuñez had in fact used a PRPB vehicle. (ECF No. 40 at 9). That matter was resolved by the government's opposition. (ECF No. 47 at 12). And Nuñez testified he drove a car rented by the PRPB. (ECF No. 116 at 9).

driver's side door and hand Torres cash money. (*Id.* at 22). Torres handed him plastic baggies Nuñez presumed to be cocaine based on their white powder contents. (*Id.*). Torres then headed off towards Barrio Llanos, which required a second U-turn. (*Id.* at 23). Nuñez proceeded to identify a video he took with his phone that day of the colmado area around the time of the second transaction. (*Id.* at 25; DE 11). In the 18-second video, you can see the colmado, Torres's Nissan, and the person Nuñez identified as the buyer though not standing by the Nissan. (*Id.* at 26).

As to the May 1 events, Nuñez testified he again took a PRPB rented vehicle around 4:00pm to surveil Torres's home, this time with Officer Carlos Alicea. (ECF No. 116 at 30-31). He had his monocular with him and parked near the previous' day spot. (*Id.* at 30). He saw Torres come out of his home wearing a white t-shirt with a Michael Jordan logo, black shorts, and white sneakers. (*Id.* at 32). A person approached Torres and handed him cash money. (*Id.*). Torres went back in the home and came out and handed the person a baggie with what Nuñez understood to be marijuana. (*Id.* at 32-33). Torres left in his Nissan towards Barriada San Luis and Aibonito. (*Id.* at 33, 41). Nuñez did not follow. (*Id.* at 33).

During cross, Nuñez identified the cyclone fence surrounding the sides and back of Torres's house. (ECF No. 116 at 43). And Nuñez confirmed that he had parked at a "strategic location" while conducting surveillance from which he could see Torres perform drug transactions and could zoom in with his monocular. (*Id.* at 46-48, 50-51, 57-58, 62). The monocular was smaller than the size of his hand, "mak[ing] it less difficult for [him] to be noticed while doing surveillance." (*Id.* at 71-72). Nuñez confirmed he decided not to take photographs or any other video so as to avoid alerting others of his presence and put himself in danger. (*Id.* at 45).

### 2. The government's witnesses

The government called PRPB Officer Arnaldo Luna Borges ("Luna") of the Drugs and Narcotics Division in Aibonito. (ECF No. 116 at 73-74). Luna executed the search warrant in Torres's

home on May 8, 2024. (*Id.* at 75-76). The search warrant authorized the search of the first floor of a two-story house. (*Id.* at 77). He found Torres at home in the first floor. (*Id.* at 77-78). Luna conducted the search assisted by a K-9, which marked different areas in the home. (*Id.* at 79-80). Luna started the search in the bedroom Torres identified as his. (*Id.* 81). There he found a cocaine rock, paraphernalia consisting of baggies, and $28,000. (*Id.* at 81). He then placed Torres under arrest and read him his Miranda rights. (*Id.* at 82). Afterwards, Luna overheard Torres tell Seargent Rivera that he had more drugs and firearms. (*Id.* at 83). Luna then went to the back part of the house to continue the search because the search warrant "indicated that the residence and its surroundings had to be searched." (*Id.*).

Prompted by Torres, Luna went to a small wooden shed in the back of the house. (*Id.* at 84). He did not have to go outside any fenced area to reach the shed. (*Id.*). However, you do have to "step out of the property and go around it because there's no access to that wooden shed from inside the property." (*Id.* at 100). When he got to the shed its door was laying down on the floor in front of the shed's window. (*Id.* at 85). When he went inside, Luna could see paraphernalia (more baggies) on top of a table. (*Id.*). He also found two rifle style firearms, rifle parts, and three or four cocaine rocks inside a bag in the shed. (*Id.* at 85-86).

Luna also participated in the execution of a search of Torres's Nissan, after the K-9 marked the car on May 8. (ECF No. 116 at 88). Luna requested the search warrant and did not recall asking Torres for his permission to search the car on May 8. (*Id.* at 88, 99). He found several baggies of cocaine in the car. (*Id.*).

### 3. Torres's witnesses

Torres called his sister, Melanie Torres-Benitez ("Melanie"), to the stand. (ECF No. 116 at 105). Melanie was not living with Torres in 2024, but she did visit "some evenings" "during the week." (*Id.* at 107). She had moved out when she was 14, and was 35 at time of the hearing. (*Id.* at 105, 115).

And in between, she had lived in the house "at some point" "as a renter." (*Id.* at 119). On the morning of May 8, 2024, she got a call that there was "a situation in progress with my brother in the residence" and that here were "many police officers" there (*Id.* at 107-08). When she got to the house, the road was closed and the police present told her she could not "get closer." (*Id.* at 109). Melanie stayed next to the house. (*Id.*). She saw her brother outside the house handcuffed and an officer go to the left side of the house and return later saying "bingo, I won, I won, I won." (*Id.* at 110-12). At that point, Torres was in the carport area. (*Id.* at 112). As to the shed, Melanie testified "[i]t had a door that was unhinged by one side." (ECF No. 116 at 114).

Torres also called PRPB Officer José Gabriel Espada Rivera ("Espada"). (ECF No. 116 at 129). Espada worked with the Police of Puerto Rico Technical Services Unit and took the photographs on May 8 of the search. (*Id.* at 130). When shown Government's Exhibit (GE) 6-F, which shows the shed and the door lying on its side on the floor, he said "[t]he door was there," no one "took the door off." (*Id.* at 131).

Day 3- Torres

Torres took the stand on the third and final day. (ECF No. 117 at 3). Torres was at home producing music with his headphones and a microphone when the police arrived on May 8. (*Id.* at 4). They identified themselves as police officers, put him under arrest, and handcuffed him. (*Id.* at 5-6). Yet, he was not given his Miranda rights verbally until the officers found "something in the main room." (*Id.* at 6-7). The police kept searching and asked him about "the girl" outside. (*Id.* at 7). They also told him the K-9 had marked positive to his car and tried to convince him to consent to searching his car, but he refused. (*Id.* at 8). He understood their insistence "as a threat" that they could also arrest his sister "and involve her in the situation." (*Id.* at 8). Then, he heard Seargeant Rivera tell officer Luna that he "had supposedly said that I had more things in the back of the home." (*Id.*). He had said no such thing. (*Id.* at 8-9). After he again refused to sign a consent form, the officers "were mad" and

took him to the shed in the back of the home. (*Id.* at 9). When they got there the door was on the frame of the shed. (*Id.*). Sergeant Rivera instructed the other officer to wait and removed the door before the other officer took the picture of the shed. (*Id.* at 10). He was neither asked nor provided consent to search the shed. (*Id.*).

During cross-examination, Torres confirmed he lived on the first floor of the home. (ECF No. 117 at 13). And he also confirmed that the shed "belonged" to his residence and it contained "some" of his "belongings." (*Id.* at 18, 28). Torres admitted he had been in the shed more than once and in May of 2024. (*Id.*). When asked about the seizure of "a lot of money" from his room, approximately $20,000, he stated that whether it was a large amount of cash was a matter of "perspective." (*Id.* at 21). Torres clarified that he knew Sergeant Rivera, but not from any previous arrest or the gym. (*Id.* at 25-26). Still, Torres maintained that he did not request to speak to Seargeant Rivera nor told him about any rifles or drugs in the shed. (*Id.* at 26-27, 31). Torres was, however, present when the police searched the shed and admitted that there were "belongings" of his inside the shed. (*Id.* at 28). But the bag was not his and neither were the rifles. (*Id.* at 29, 32-33). Finally, Torres admitted that his testimony that day was the first time he ever mentioned Seargent Rivera removing the door to the shed. (*Id.* at 40). And the first time he mentioned that Seargent Rivera had told Luna that Torres had told him that "there were more things in the back." (*Id.* at 41).

**Post-testimony proceedings**

Following the hearings, the parties filed simultaneous supplemental briefs reiterating their positions. (ECF. No. 121, 122).

**DISCUSSION**

I.     *Franks* **and the validity of the search warrant**

"Under *Franks*, a defendant may overcome the presumption of validity that surrounds an affidavit in support of a search warrant and obtain an evidentiary hearing if he 'makes a substantial

preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause.'" *United States v. Moon*, 802 F.3d 135, 149 (1st Cir. 2015) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); citing *United States v. McLellan*, 792 F.3d 200, 208-09 (1st Cir. 2015)). Here, I granted such a hearing after receiving Torres's sworn statement, the gym attendance sheets, Torres's physical impossibility arguments, and the videos first mentioned at the motion hearing (surveillance by Nuñez and the agent's drive time video). Still, I find that Torres failed to meet the requisite threshold by a preponderance of the evidence. *See United States v. Tzannos*, 460 F.3d 128, 136 (1st Cir. 2006) (*Franks* showing must be made by the defendant by preponderance of the evidence); *United States v. Guzman-Batista*, 783 F.3d 930, 938 (1st Cir. 2015) (the defendant bears the "burden of persuasion").

At the hearing, Nuñez gave a cohesive detailed account of his surveillances of Torres on April 30 and May 1. He testified consistently that he rented an unmarked car used for "undercover purposes." (ECF No. 116 at 10, 39, 44). On both occasions, once he arrived at Torres's home in Barriada San Luis, he was able to position himself at a strategic location in a street in front of Torres's home, from where he had an unobstructed view of the home and the drug transactions. (*Id.* at 14, 16-20, 31-33, 35-36, 46-48, 57-58). Torres also had a clear view of the transaction by the colmado on April 30. (*Id.* at 22-23, 50-51, 57). And he used a small monocular that allowed in "to zoom into . . . the area of defendant's residence" while remaining discrete. (*Id.* at 46-47, 57-58). Meanwhile, Torres's efforts to undermine his credibility by pointing to inconsistencies or details omitted from the affidavit and his gym attendance fall short of meeting his burden: that the affidavit contained a false statement that was made knowingly and intentionally or with reckless disregard for the truth and that the false statement was necessary for the finding of probable cause. In the end, Torres's promise of exposing a work of fiction amounted to nothing short of a tall tale.

For starters, Torres makes much of Nuñez's failure to take photographs or videos of the drug transactions. (ECF No. 121 at 9). But Nuñez testified that he did so for his own safety, despite the PRPB policies and procedure which "recommends that if viable," those be taken. (*Id.* at 6, 45, 51-52). To be sure, Torres logically points to Nuñez's use of a monocular as arousing suspicion (ECF No. 121 at 9), but the monocular here was smaller than the size of Nuñez's hand and there was no indication that he used it nonstop during his surveillance (ECF No. 116 at 71-72). Still, Nuñez did manage to record the moments after the transaction by the colmado using his phone. (DE 11). The angle of the video played in Court showcases Nuñez's attempt to remain unnoticed as he took the video. And the video itself confirms Nuñez's surveillance, the presence of Torres's car by the colmado, and the buyer as described in the affidavit. (ECF No. 116 at 24-28, 52-56).

Similarly, the inconsistencies Torres points to do not detract from Nuñez's credibility. That is, the fact that the car he used was rented by the PRPB and not a PRPB confidential vehicle is immaterial. (ECF No. 121 at 10). Moreover, Torres's reliance on details such as how others accompanied Nuñez on surveillance and that Nuñez made a U-turn after passing the colmado is ultimately unconvincing. Nuñez confirmed that the affidavit is not a verbatim account (ECF No. 116 at 56), and those details are immaterial to the finding of probable cause and their non-inclusion appears unintentional. *See United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015) (errors that are clearly only negligent do not call for a *Franks* hearing).

True, other than the video, there is no corroboration for Nuñez's testimony. But Torres, who bears the burden, ultimately failed to show how his testimony was "so internally inconsistent or implausible that no reasonable factfinder would credit it." *Guzmán-Batista*, 783 F.3d at 937; *Rivera-Gómez*, 900 F.2d at 4 (explaining that "[o]nce credited," the defendant's testimony "supported the district court's rationale almost singlehandedly" because the "[d]efendant's testimony was neither severely impeached nor inherently improbable"). And Torres cannot fill that gap by pointing to his

own denials. Those "disclaimer[s] constitute[] no more than a conclusory and unsupported allegation that falls well short of the 'substantial preliminary showing' necessary to justify a *Franks* hearing." *Moon*, 802 F.3d at 149-50 (citing *United States v. Southard*, 700 F.2d 1, 10 (1st Cir. 1983) (upholding rejection of *Franks* hearing where district court found appellants' flat denials of gambling-related conversations insufficient to meet the 'substantial preliminary showing' requirement)). *See United States v. Pérez-Greaux,* 83 F.4th 1, 33 (1st Cir. 2023) (same).

Finally, Torres's original showing that largely relied on his gym attendance ultimately evaporated into smoke. At the hearing, Torres passed up on the opportunity to show he could not have been at both the transactions and the gym. He did not challenge the government's proffer that the gym was about a kilometer away or a two-minute drive from Torres's home and the nearby gym and consented to the Court taking judicial notice of the distance. (ECF No. 72 at 2-3; ECF No. 89 at 10; ECF No. 73 at 2). So, the 31-minutes window on April 30 and the 6-minute window on May 1 made it entirely plausible for Torres to have been at both places as alleged. And to add to that, the gym times are self-reported. (ECF No. 116 at 17, 38, 45). Finally, Torres's assertion that he works out in different clothes than the shorts, sneakers, and t-shirt Nuñez described is "no more than a conclusory and unsupported allegation that falls well short of the 'substantial preliminary showing' necessary to justify a *Franks* hearing." *Moon*, 802 F.3d at 149-50 (citation omitted).

## II.    The shed

Torres's challenge to the search of the shed puts him between a rock and a hard place. If, on one hand, the shed is appurtenant to his residence, then it falls plainly within the scope of the search warrant, or, at a minimum, makes it reasonable for an officer acting on a good faith basis to believe it was covered by the warrant. On the other hand, if the shed is not appurtenant to the first floor of a multi-unit dwelling, Torres would either lack an expectation of privacy in the common area or lack standing to challenge an area not his. In any event, given Torres admitted that the shed belonged to

his residence and that he used it to store personal belongings (a fact the government relies on), I will assume he indeed has standing to challenge the search of the shed and a privacy interest.

The description of the property to be searched in the warrant makes it at least reasonable for an officer to understand the search of the shed was covered by the warrant. The search warrant identifies the residence to be search as having "two floors," the first of which is to be searched. (ECF No. 55-1 at 1). It goes on to describe the first floor as having "a concrete staircase that gives access to the upper floor." (*Id.*). That staircase is outside the living quarters of the first floor, yet still described as part of the first floor. (Compare ECF No. 55-1 with GE 1). Thus, following that same blueprint, the shed, which is in the back, on ground level, and outside the interior living quarters of either floor, is also on the first floor. Were there any doubt, and fatal to his arguments, in his testimony, Torres admitted that the shed belonged to his residence. (ECF No. 117 at 18). And the government repeatedly introduced testimony and photographs showing that the shed was within the fenced-in areas of the property. (*See, e.g.,* ECF No. 116 at 42-43, 94; GE 2-3, 6F; DE 9D).

Moreover, "[a] warrant authorizing the search of a premises permits the search of its appurtenant areas." *United States v. Legault*, 323 F. Supp. 2d 217, 222 (D. Mass. 2004) (holding that warrant for second-story apartment permitted search of the building's basement) (citing among others *United States v. Ferreras*, 192 F.3d 5, 10-11 (1st Cir. 1999) (attic); *United States v. Asselin*, 775 F.2d 445, 446-47 (1st Cir. 1985) (birdhouse and parked car); *United States v. Canestri*, 518 F.2d 269, 273-74 (2d Cir. 1975) (basement storeroom); *Houser v. Geary*, 465 F.2d 193, 195-96 (9th Cir. 1972) (hothouse, shed, and garage adjacent to the dwelling)). *See also United States v. Fagan*, 577 F.3d 10, 12, 14 (1st Cir. 2009) (warrant authorizing search of "third-floor apartment and cellar" permitted search of closet eight feet from apartment's front door in area where no other apartments were located); *United States v. Principe*, 499 F.2d 1135 (1st Cir. 1974) (holding that "the officers could reasonably suppose, given the second floor layout and its proximity to the apartment, that the cabinet [outside the apartment]

13

was appurtenant to the apartment, as it in fact was"); *United States v. Montieth*, 662 F.3d 660, 670 (4th Cir. 2011) (affirming district court's conclusion "that the shed was within the curtilage of the home, and that the warrant for the residence was therefore 'sufficient to include within its scope the shed that is within the privacy fence and close to the residence itself.'"). Within this Circuit, appurtenancy is interpreted "in its conventional sense. A typical dictionary definition of 'appurtenant' indicates that it means "[b]elonging as a property or legal right (to); spec. in Law, constituting a property or right subsidiary to one which is more important." *Fagan*, 577 F.3d at 13 (quoting Oxford English Dictionary 590 (2d ed. 1989)). The testimony and the building's layout all point to the shed as being appurtenant to Torres's residence. In the end, Torres's testimony confirmed that he exercised property rights over the shed. He admitted it was part of his residence (the lower level), that as of "May of 2024" he had been inside the shed, and that in the shed there were "belongings of [his]." (ECF No. 117 at 18-19, 28).

Finally, were there any doubt, because the shed was within the fenced-in area of the residence to be searched, and located just behind the cement structure after passing the cement staircase described to be on that same level, the officers executing the warrant could reasonably understand that the shed was appurtenant to the residence and thus covered by the warrant. *See United States v. Leon,* 468 U.S. 897, 923 (1984) (recognizing the good faith exception); *Maryland v. Garrison*, 480 U.S. 79, 88 (1987) (holding that regardless of interpreting the search warrant as limited to the apartment or the entire third floor, "the officers' conduct was consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment"); *Principe*, 499 F.2d at 1137 ("[T]he officers could reasonably suppose, given the second floor layout and its close proximity to the apartment, that the cabinet was appurtenant to the apartment, as in fact it was.").[4]

---

[4] Because I find that the shed was within the scope of the warrant, it is immaterial whether the door to the shed was already unhinged and lying in front of the shed. Having said that, I afford the officers

In fact, Officer Luna testified that he went to the back of the house because the search warrant "indicated that the residence and its surroundings had to be searched." (ECF No. 116 at 83). As stated by the Court of Appeals in *Fagan*, "[t]he short of it is that a police officer sometimes can make an objectively reasonable determination of appurtenancy through a common-sense evaluation of information contained in the warrant, the layout, and evidence encountered at the scene. This is such a case." *Fagan*, 577 F.3d at 14-15 (citing *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999) ("[T]he close proximity of the area to McCaster's living quarters and its enclosure within the duplex unit supports the finding that it was reasonable for the officers to believe that the area fell within the scope of the warrant.")).

### III.    Torres's statements

Torres makes a single argument in support of suppression of his alleged admissions, that he didn't make them. As such, he waives any other argument. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). Having had the opportunity to receive Torres's testimony (and witness his evasive demeanor), his sister's, and that of the police officers, I find that Torres lacks credibility and thus recommend denying his request to suppress his statements. Moreover, as to Torres's argument that it simply does not make sense that he would have even made those admissions, I cannot agree. For one, common sense is a misnomer. Common sense is not universal but subjective; it varies across individuals and contexts, and it is shaped by each person's experience, perception, and shifting social norms. Second, there is a world in which any such statements are not illogical. Torres had already identified his bedroom in the three-bedroom home (ECF No. 116 at 81), which ended up being the only one with contraband inside the house, and Torres could have understood the shed (but not his

---

credibility on this issue and note the paint differences seen in GE 6F. In that same vein, Torres's argument that he did not consent to the search of the shed is beside the point. Conversely, Torres's contested statement to the effect that he had more drugs and firearms in the shed would support the officers' belief that the shed was part of his residence and therefore covered by the warrant.

car) to be covered by the warrant such that the firearms and additional drugs there would also be found by the officers, including the K-9. And he made these statements to Seargeant Rivera, a person he knew. (ECF No. 117 at 25). Finally, Torres's sister's testimony does not alter the outcome. Her testimony was limited to what she perceived from the outside and temporally unmoored from the events that morning.[5] Therefore, I recommend Torres's motion be denied in its totality.[6]

## CONCLUSION

For the foregoing reasons, I recommend Torres's motion to suppress be **DENIED**.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to it must be specific and must be filed with the Clerk of Court within fourteen days from the date it is filed. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30-31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED**.

In San Juan, Puerto Rico this July 24, 2026.

*s/ Mariana E. Bauzá-Almonte*
MARIANA E. BAUZÁ-ALMONTE
United States Magistrate Judge

---

[5] If anything, her testimony is at odds with not just the officers' testimony, but also her brother's. She identifies a lone agent going to the back of the house, whereas the officers and her brother all testified to going together. (*Compare* ECF No. 116 at 112 *with* ECF No. 117 at 27-28 and ECF No. 116 at 83-84).

[6] While Torres also sought suppression of the contraband found in his car during the execution of a separate search warrant, any argument for suppression was limited to it being affected by the search of the home. Finding no violation there, I also recommend suppression of the items in the car be denied.

16